## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**IVONNE CINTRÓN-SOSTRE**,

    Petitioner,

    v.

**COMMISSIONER OF SOCIAL
SECURITY**,

    Defendant.

Civil No. 19-1297 (BJM)

### OPINION AND ORDER

Ivonne Cintrón-Sostre ("Cintrón") seeks review of the Social Security Administration Commissioner's ("Commissioner's") finding that she is not entitled to disability benefits under the Social Security Act ("the Act"), 42 U.S.C. § 423. Cintrón claims that the administrative law judge ("ALJ") improperly evaluated the medical evidence and erred in making the residual functional capacity ("RFC") determination. Docket No. ("Dkt.") 23. The Commissioner opposed. Dkt. 25. This case is before me by consent of the parties. Dkt. 7-8. After careful review of the administrative record and the briefs on file, and for the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

### STANDARD OF REVIEW

After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and her delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Secretary of Health & Human Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Secretary of Health & Human Services*, 955 F.2d 765, 769 (1st Cir. 1991). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Visiting Nurse Association Gregoria Auffant, Inc. v. Thompson*, 447 F.3d 68, 72 (1st Cir. 2006) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court "must affirm the [Commissioner's] resolution, even if the record arguably could

justify a different conclusion, so long as it is supported by substantial evidence." *Rodriguez Pagan v. Secretary of Health & Human Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when she "is not only unable to do [her] previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

Generally, the Commissioner must employ a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Goodermote v. Secretary of Health & Human Services*, 690 F.2d 5, 6–7 (1st Cir. 1982). In step one, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At step three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, she is conclusively presumed to be disabled. If not, the ALJ assesses the claimant's RFC and determines at step four whether the impairments prevent the claimant from doing the work she has performed in the past. If the claimant is able to perform her previous work, she is not disabled. 20 C.F.R. § 404.1520(e). If she cannot perform this work, the fifth and final step asks whether the claimant is able to perform other work available in the national economy in view of her RFC, as well as her age, education, and work experience. If the claimant cannot, then she is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

An individual's RFC is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the

claimant can perform her previous work, she is not disabled. 20 C.F.R. § 404.1520(e). If she cannot perform this work, the fifth and final step asks whether the claimant can perform other work available in the national economy in view of her RFC, as well as age, education, and work experience. If the claimant cannot, then she is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At steps one through four, the claimant has the burden of proving that she cannot return to her former employment because of the alleged disability. *Santiago v. Secretary of Health & Human Services*, 944 F.2d 1, 5 (1st Cir. 1991).  Once a claimant has demonstrated a severe impairment that prohibits return to her previous employment, the Commissioner has the burden under step five to prove the existence of other jobs in the national economy that the claimant can perform. *Ortiz v. Secretary of Health & Human Services*, 890 F.2d 520, 524 (1st Cir. 1989).

Additionally, to be eligible for disability benefits, the claimant must demonstrate that her disability existed prior to the expiration of her insured status, or her date last insured. *Cruz Rivera v. Secretary of Health & Human Services*, 818 F.2d 96, 97 (1st Cir. 1986).

## BACKGROUND

The following is a summary of the treatment record, consultative opinions, and self-reported symptoms and limitations as contained in the Social Security transcript ("Tr.").

Cintrón was born on February 17, 1980, does not understand the English language (communicates in the Spanish language), completed a year and a half of undergraduate studies, and worked as a secretary. Cintrón applied for disability insurance benefits, claiming to be disabled since December 31, 2012 (onset date) at age 32[1] due to an affective disorder. Cintrón met the insured status requirements of the Act through December 31, 2017. Tr. 44, 46, 64, 96, 265, 369, 380-382.

*Treating Sources*

**First Hospital Panamericano**

Cintrón was treated for severe depression and suicidal risk on September 2, 2013 (emergency visit and partial hospitalization), from September 16 to 23, 2013 (admitted), and from November 15 to 24, 2013 (admitted). She was diagnosed with recurrent severe major depression

---

[1] Cintrón was considered to be a younger individual (Tr. 53), and "[i]f you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work." 20 C.F.R. 404.1563(c).

with psychosis and treated with medications and group therapy. Some of her stressors were relationship issues with her partner, social integration, and financial problems. Her Global Assessment of Functioning ("GAF") in September 2013 was 50, and in November 2013 between 50-70. Tr. 118, 144-147, 256-257, 441.

Notes from the September 2 partial hospitalization indicate that Cintrón had stopped taking her medications and attending appointments. Tr. 165-166, 462-463.

The September 16 hospitalization discharge documents indicate that Cintrón was alert, oriented (in time, place, person, and situation), and expressed herself more logically and coherently. Her mood was normal. She was not agitated nor showed psychomotor delay. Her insight was superficial. Her judgment and impulse control had improved. She denied having suicidal or homicidal thoughts, or perceptual disturbances. During treatment, Cintrón had been able to tolerate one hour of group activity and was able to integrate with the therapeutic groups. Her participation had been active. Post-discharge, she would needed assistance or supervision with her medication routine and should develop skills to manage stress and to restructure her free time. Cintrón was to have follow-up appointments with a psychiatrist from APS ("APS") Clinics of Puerto Rico (summary below). Tr. 117-124, 439-447.

Notes from the November 15 hospitalization indicate that Cintrón was unstable upon arrival but went voluntarily to the institution. She completed her hospitalization without complications and with diminished acute symptomatology. At the time of her discharge, Cintrón was alert, calm, cooperative, receptive, and oriented in person, time, and space. Her insight was superficial, her mood was euthymic, her affect was broad, her social judgment was diminished, and her impulse control was adequate. She denied having suicidal or homicidal thoughts, and no perceptional disturbances were identified. This time, she tolerated one hour of group activity, entering sessions after being brought in by a therapist, but only partially or selectively integrated into the therapeutic groups. Follow-up psychiatric care and strict compliance with her medication regimen was recommended, in addition to more family supervision regarding access to high-risk medications and guns, as well as observing for any abrupt changes in mood or behavior. A follow-up appointment was scheduled with a psychiatrist from APS. Tr. 143-150, 465-473.

Cintrón was again treated at Hospital Panamericano on November 24, 2015, and showed significant improvement. Tr. 250, 633.

Cintrón v. Commissioner of Social Security, Civil No. 19-1297 (BJM)                    5

**APS Clinics of Puerto Rico**

Cintrón received treatment from APS from September 26, 2013 to July 14, 2014 for major depressive affective disorder, recurrent episode, severe. Medications were prescribed (Zoloft, Klonopin, Risperdal, Ambien). Notes in general indicate that she consented to treatment and her condition was stable with treatment. Tr. 125-141, 474-490.

Notes from July 2014 indicate that Cintrón was improving with treatment. She was depressed and anxious, but all areas were within normal limits, including her memory and attention, except for diminished concentration. She was oriented in time, place, and person. Her thought process was logical. Her impulse control was normal. Her judgment was good and her insight was adequate. Cintrón denied having suicidal or homicidal thoughts, and mostly denied hallucinations. Her GAF score was 60. Tr. 126-127, 257-258, 475-477, 480.

**Dr. José L. López-Márquez (Inaya Psychiatric Medical Group)**

Dr. José López ("Dr. López) submitted a psychiatric medical report dated August 18, 2014, found at Tr. 153-163, 258, 493-503 and summarized below.

Cintrón sought Dr. López's help for her mental health symptoms, brought on by a marital problem and the loss of her job. Dr. López treated Cintrón monthly or every two months since October 28, 2013, and diagnosed major depressive disorder, severe, recurring, that affected her functioning in work, social, and family areas. Her GAF was 45. Dr. López prescribed medications (Wellbutrin, Klonopin, Risperdal, Ambien, Zoloft). Her mother would accompany her to her appointments.

Cintrón felt useless and had low self-esteem. Cintrón's psychomotor activity was diminished, logical, coherent, and relevant. Her facial expression was of sadness. She spoke with a low tone of voice, and her use of language was simple, adequate, and understandable. Her symptoms also included sadness, nervousness, anxiety, agitation, constant negative thoughts, frequent crying, restlessness, insomnia, anhedonia, violent behavior, and feelings of worthlessness and guilt. She also had suicidal and homicidal thoughts.

On testing for immediate and short-term memory, Cintrón could only retain two out of five words in each test. She could remember recent events and some remote events. She had attention and concentration problems, was disoriented at times, and experienced visual and auditory hallucinations and perceptional disturbances. Her insight was superficial.

Dr. López assessed that Cintrón was not expected to improve in the next twelve months. She would self-isolate and avoided others, she did not have the capacity to make appropriate decisions, had a reduced ability to tolerate stress and would be easily irritated, could not pay attention and concentrate on following instructions and completing a task, and was unable to handle funds. She could drive in case of an emergency or short distance. Tr. 153-163, 258, 493-503.

The record also contains Dr. López's mental examination notes from August 2014 until December 2017. Appointments were every one or two months. Most notes indicate that Cintrón's orientation was poor, and her concentration and introspection were inadequate. Most notes also indicate that Cintrón's attention and judgment were inadequate, with the exception of the mental exams dated September 2014, and August, October and December 2017, in which Cintrón's attention and judgment were marked as adequate (Tr. 23, 26, 29, 183, 532).[2] Her mood was restricted and her facial expression was sad. She spoke coherently and was logical and relevant. Her affect was appropriate and she was cooperative. She did not express suicidal or homicidal ideas. Her GAF score was between 40-50. Medications were prescribed. Tr. 22-37, 177-248, 551-580, 613-631.

**San Juan Capestrano Hospital**

Cintrón was partially hospitalized at San Juan Capestrano Hospital from December 19 to 27, 2017, for recurrent severe major depression and social dysfunction. She was treated with pharmacotherapy and group therapy. Tr. 13, 15. The discharge summary indicates that Cintrón partially responded to treatment and had to continue an outpatient basis. Prognosis was reserved. Tr. 15.

Notes indicate that Cintrón developed awareness and a better understanding of her psychiatric condition. She actively participated in group therapy and expressed commitment to her recuperation process. Tr. 13. In a recovery plan form Cintrón filled out, she recognized as stressors her economic situation, health problems, not going out as much as before, and feelings of anxiety, anguish, nostalgia, and anger. To remain calm and stay safe and healthy, Cintrón wrote that she could be with family, walk, and take her medications. Tr. 14.

---

[2] I note that the English translations at Tr. 31, 34, and 37 have check-marked the boxes for inadequate attention and judgment, but the original documents in the Spanish language at Tr. 23, 26, 29 have crossed the word "adecuado" and not "no adecuado."

She was to continue ambulatory psychiatric treatment with Dr. López.

***Procedural History***

On June 5, 2014,[3] Cintrón applied for disability insurance benefits claiming to be disabled since December 31, 2012. Tr. 44, 369.

Cintrón claimed in a function report dated July 29, 2014, that her condition affected her ability to remember, concentrate, understand, follow instructions, and complete tasks. She could not pay attention for long, would forget spoken instructions, and needed to read written instructions several times to understand them. She spent her day locked up in her bedroom. During good days, she would turn on her television; during bad days, she would lock herself up in the dark. She had a lot of nightmares, affecting her sleep, and saw shadows and heard voices. As to personal care, she had to be reminded to take care of her personal needs and had to be given her medications. She could prepare simple meals, such as a sandwich and a boiled egg. She would do house and yard work depending on her mood. Sometimes she would sweep and mop or do a load of laundry, and other times she didn't feel like it and had to be encouraged to do them. She did not have hobbies. She spent time with others although she had no interest in relating to people anymore. She talked daily on the phone with her sister around fifteen minutes. She would accompany her husband to do the groceries, go to appointments, or visit her grandmother twice a week. She had no contact with authority figures. She was afraid to go out alone and did not drive because her mind would go blank. She did not handle funds because she did not have the concentration for it. She handled stress and changes in routine by taking medications. Tr. 99-105, 391-397.

Cintrón stated in a disability report that she stopped working because she was laid-off from her state government secretarial job. Tr. 381-382. An interviewer reported in a Field Office Disability Report noting no difficulty in Cintrón's ability to understand or concentrate. Cintrón spoke normally, was coherent and cooperative. Tr. 378.

According to the transcript index and Tr. 517, the Disability Determination Program referred the case to Dr. Carmen Sepúlveda ("Dr. Sepúlveda") for a mental status consultative examination, which according to Tr. 517 took place on July 18, 2014. However, the report contained in this exhibit at Tr. 518-522 makes reference to a Ms. María Román, not Ms. Ivonne

---

[3] The ALJ stated at Tr. 44 that the application was filed on June 4, 2014, as confirmed at Tr. 265. Cintrón cites the July 5, 2014 date that appears in the transcript index for the application summary at Tr. 369. The date that appears at Tr. 369 is June 5, 2014.

Cintrón. These are the same transcript pages that the claimant and the Commissioner make reference to in their briefs (Docket No. 23 at page 8; Docket No. 25 at page 7, respectively), and that the ALJ makes reference to as Exhibit 6F at Tr. 50-51.  I do note that the background information contained in this report under Ms. Román's name matches the information in the record for Ms. Cintrón. I am summarizing Dr. Sepúlveda's examination with the information contained in the ALJ's decision and in the report by Dr. Jennifer Cortés ("Dr. Cortés") (record evidence summarized below).

The following is extracted from Dr. Cortés's report. Dr. Sepúlveda diagnosed major depressive disorder. Cintrón was clean and well-groomed, alert, cooperative, spontaneous, logical, relevant, and coherent. Cintrón's affect was depressed, partially oriented with diminished concentration, and unable to manage funds. Tr. 258. "CE opined that [claimant] will have difficulties understanding instructions and concentrating, but still able to do simple tasks, solve simple problems and take simple decisions." Tr. 260.

The ALJ's decision contains the following information. Cintrón "was depressed, but with mostly normal mental status findings … Dr. Sepulveda also documented coherent, logical and relevant thought with no association problems or mental block despite some self-reported suicidal ideation. (Ex. 6F at 3) The claimant asserted both visual and auditory hallucinations, and she asserted she was confused about the date, but was fully oriented about person and location. (Ex. 6F at 3) Her immediate and short-term memory were decreased, but her recent and remote memory were normal. (Ex. 6F at 4) Her attention and concentration were decreased, but her general knowledge appeared to be average and her judgment and insight were normal. (Ex. 6F at 4) Dr. Sepulveda found the claimant could do simple tasks, solve simple problems, and make simple decisions, but had difficulty with instructions, concentration and memory, and problems with persistence and adapting to changes. (Ex. 6F at 4) She described the claimant's mental functional 'capacity' as moderate. (Ex. 6F at 4) She confirmed a diagnosis of severe major depressive disorder with no health complications, noted a good prognosis considering the claimant's history, and opined the claimant was able to manage funds. (Ex. 6F at 4)." Tr. 50-51.

On August 25, 2014, Dr. Cortés, non-examining consultant, found that Cintrón's condition equaled listing 12.04 Affective Disorders. Tr. 257, 523-524. The case was referred on second occasion to Dr. Cortés with additional medical evidence from APS. On November 6, 2014, Dr. Cortés noted that the record reflected that Cintrón had received duplicate services for her mental

condition during the same time period. Dr. Cortés gave more weight to the progress notes from APS over evidence from Dr. López because he did not submit progress notes to confirm statements or visits by Cintrón. Tr. 258.  After considering Cintrón's severe condition and allegations under listing 12.04 for affective disorders, Dr. Cortés assessed that based on the evidence in record, Cintrón was able to understand, remember, and execute simple one or two-step instructions; maintain attention and sustain concentration, persistence, and pace; adapt to changes; and interact adequately with others. Under paragraph "B" criteria of listing 12.04, Dr. Cortés found that Cintrón had a moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and one or two repeated episodes of decompensation, each of extended duration. Dr. Cortés noted that the medications prescribed to Cintrón were for a severe condition, but that her allegations were partially credible and not fully supported by the medical evidence in the record. Tr. 257-263, 525.

Cintrón's claim was initially denied on November 7, 2014. Tr. 86, 265. Cintrón requested reconsideration. Tr. 286.

In another function report submitted in January 2015, Cintrón reiterated what she reported in her first function report, and claimed being irritable, crying frequently, and not being able to handle tension or pressure. She had memory and concentration problems, and always wanted to be alone. She had no interest in interacting with others. Tr. 106-113. Cintrón also indicated in a disability report on appeal that her condition had changes since approximately October 28, 2013, because her "sadness and anxiety have rendered me a very unstable person. The lack [of] sleep has [gotten] worse." Tr. 401. Her activities had also changed due to her conditions because "I have no other activity than being medicated and laying around all day and night. I have no interest in life or any social activity." Tr. 425.

The case was referred to Dr. Annette De Paz ("Dr. De Paz"), who affirmed on March 24, 2015, Dr. Cortés's mental RFC assessment. Tr. 271-279, 549.

On March 24, 2015, the claim was denied on reconsideration. Tr. 89, 280.

Cintrón requested a hearing before an ALJ. Tr. 291.

A hearing before ALJ Shirley Anne Marzán was held on June 30, 2017. Cintrón and vocational expert ("VE") Michael Frank testified. Tr. 60-82.

Cintrón testified that she stopped working because she would get anxious, cried a lot, would lose self-control, couldn't stand being pestered, would get angry and tell people off, and

could not stand herself or being in groups. Her memory, attention, and concentration were affected. Medications helped on occasion.  Cintrón also clarified that she stopped working in her secretarial municipal government job because there was a change in government. Tr. 64-65.

She lived with her mom and husband. She felt no desire to do anything and spent her day lying down and crying. She occasionally needed help for her personal care, bathing, and getting dressed. She did not shower or change clothes daily. Her mother and husband helped her take her medications. She did not perform house chores. She did not read, barely watched television, and did not like participating in activities outside of the house (such as church, movies, shopping). If she participated in an activity outside of the house, it had to be quick because she would despair. Her condition affected her ability to relate to others.  Tr. 65-71.

Cintrón further testified having been hospitalized six times. She was treated by Dr. López but was referred for treatment with APS by the psychiatric hospitals, so at some point she was simultaneously being treated by both. Cintrón did not like being treated by APS. The ALJ questioned her about the lack of treatment or medications during the year 2013, and Cintrón denied it, claiming to have attended all her appointments. Tr. 68-69.

The VE testified that Cintrón worked as a secretary (sedentary with a Special Vocational Preparation ("SVP") of six). The ALJ asked the VE if a person with following limitations could perform past relevant work or any work: understand, remember, and carry out instructions limited to performing simple, routine tasks; use judgment limited to simple, work-related decisions; respond appropriately to supervisors, coworkers and public; and frequently deal with changes in the work environment.  The VE testified that such a person could not perform past relevant work because an SVP of six requires skilled work, which is more complicated than the hypothetical provided for simple routine work. The VE testified that such a person could work in the following simple routine jobs: cleaner II (SVP one), an industrial cleaner (SVP two), or a hand packager (SVP of two).  Tr. 72-73.

The ALJ further asked if such person could work with the following limitations: understand, remember, and carry out simple routine tasks; frequently respond appropriately to supervisors and occasionally respond appropriately to coworkers and the public; and deal with changes in the work setting limited to simple work-related decisions. The VE answered that such a person could perform the simple routine jobs mentioned earlier. Tr. 73.

The ALJ then asked if such a person who could never respond appropriately to the public or work in tandem could work. The VE answered that such a person could work in these jobs. The VE explained that it is not that such a person can't be around public, which could happen occasionally, it's just that such a person could not work with the public. Tr. 73-75.

The ALJ further asked if such a person could only tolerate few changes in the work setting, could she still work. The VE answered that she could work in any of those three jobs because they are routine repetitive jobs. Tr. 74.

The ALJ added that such a person could only concentrate in blocks of one hour with a five-minute break after every hour, meaning an additional twenty minutes in excess of the normal breaks in a normal workday. The VE testified that the employer would not initially notice the additional twenty minutes, therefore, she could perform these jobs, but in the long term, the employer will notice. The VE conceded that this answer was speculative. Tr. 76. The ALJ also asked if such a person could work if she needed a fifteen-minute break every hour. The VE answered that she would not be able to work. Tr. 77.

The ALJ further asked if such a person who could only occasionally respond appropriately to supervisors would work. The VE answered that she could because they were simple jobs. Tr. 77.

To counsel's question regarding a need to dedicate ten minutes every hour to refocus on tasks, the VE answered that because these jobs are simple one or two-step jobs, if she needed ten minutes every hour to have instructions repeated or because of lack of concentration, besides normal breaks, then she would not be able to sustain work. Tr. 78. To counsel's question regarding two absences monthly or being late at least once a week during a probation period of ninety days in Puerto Rico, the VE answered that an employee cannot be absent more than six days in nine months or be late once a week or two because an employer would not tolerate that, regardless of the probation period. Tr. 79-81.

The VE testified that his opinions regarding concentration were not consistent with the Dictionary of Occupational Titles ("DOT") but were his professional opinion. Tr. 77.

On November 3, 2017, the ALJ found that Cintrón was not disabled under sections 216(i) and 223(d) of the Act. Tr. 44-55. The ALJ sequentially found that Cintrón:

(1) had not engaged in substantial gainful activity since her alleged onset date (Tr. 46);

(2) had a severe impairment (an affective disorder) which caused more than minimal functional limitations in her ability to perform basic work activities as required by SSRs 85-28 and 96-3p (Tr. 46);

(3) did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526), specifically the criteria of "paragraph B" of listing 12.04 (Tr. 47) ;

(4) retained the RFC to perform a full range of work at all exertional levels except she was able to understand, remember, and carry out instructions for simple, routine and repetitive tasks; make simple work-related decisions; interact and respond appropriately to supervisors frequently; interact and respond appropriately to coworkers occasionally but not in tandem work; never interact and respond appropriately to the public; and tolerate few changes in a routine work setting (Tr. 48). Therefore, she could not perform past relevant work (Tr. 53); but

(5) as per her age, education, work experience, and RFC, there was unskilled work that existed in significant numbers in the national economy that Cintrón could perform, such as cleaner II, industrial cleaner, and hand packager. Tr. 53-54.

The ALJ noted that the record contained no record of treatment from her alleged onset date through September 2013 (Tr. 49) and that "a longitudinal review of the treatment history demonstrates conservative treatment" with exception to the hospitalizations, which were due to situational crises due to marital problems, recent loss of employment, and decompensation when Cintrón stopped treatment and taking her medications. Tr. 51. The ALJ further noted that Cintrón's "testimony and lack of ability to remember even the most basic personal information, such as her name, is inconsistent with the overall medical evidence, including the medication prescribed" and did not support her representative's assertion of extreme restrictions in her attention, concentration, and ability to maintain pace, and her need to have instructions repeated every hour even if she were limited to simple routine tasks. Tr. 49.

The ALJ gave great weight to the opinions by State agency mental consultants Dr. Cortés and Dr. De Paz, finding that their RFC assessments and opinions were persuasive and consistent with the finding under the new standards of moderate "paragraph B" limitations. Tr. 52. The ALJ also considered Cintrón's GAF scores "in the 40's, 50's and 60's indicating she has some exacerbations of symptoms but the overall evidence demonstrates no more than moderate

limitations in mental or emotional functioning and her limitations are adequately addressed by the restrictions set out in the residual functional capacity. Those scores most consistent with the overall evidence of no more than moderate limitations are given more weight than scores indicating greater limitations." Tr. 52. I did not find a specific weight assigned to the evidence from Dr. López or APS in the ALJ's opinion, but those records were summarized, analyzed, and considered by the ALJ at Tr. 49-52.

On February 3, 2019, the Appeals Council denied Cintrón's request for review, rendering the ALJ's decision the final decision of the Commissioner. Tr. 1, 17, 368. The present complaint followed. Docket No. 3.

## DISCUSSION

Cintrón claims that the ALJ based the decision denying disability benefits on the opinions of the State agency non-examining consultants, and failed to consider as per 20 C.F.R. 404.1527 the medical opinions of the treating sources Dr. López and APS, and the consultative examiner Dr. Sepúlveda, and to give controlling weight to Dr. López's opinion. Docket No. 23 at p. 5-7, 13. Cintrón also claims that the ALJ gave more weight to GAF scores consistent with moderate limitations over scores indicating greater limitations. Docket No. 23, p. 6.

Where, as here, an ALJ reaches step five of the sequential evaluation process, the burden of proof shifts to the Commissioner to show that a claimant can perform work other than her past relevant work. *Ortiz*, 890 F.2d at 524. The record must contain positive evidence to support the Commissioner's findings regarding the claimant's RFC to perform such other work. *See Rosado v. Secretary of Health & Human Servs*., 807 F.2d 292, 294 (1st Cir. 1986). An RFC assessment is "ultimately an administrative determination reserved to the Commissioner." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (*citing* 20 C.F.R. §§ 416.927(e)(2), 416.946). But because "a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Id.* Also, when determining which work-related limitations to include in the hypothetical question, the ALJ must: (1) weigh the credibility of a claimant's subjective complaints, and (2) determine what weight to assign the medical opinions and assessment of record. *See* 20 C.F.R. §§ 404.1527, 404.1529.

The ALJ determined that through the date last insured, and based on the record evidence, Cintrón retained the RFC to perform a full range of work at all exertional levels except she was

Cintrón v. Commissioner of Social Security, Civil No. 19-1297 (BJM)                    14

able to understand, remember, and carry out instructions for simple, routine and repetitive tasks; make simple work-related decisions; interact and respond appropriately to supervisors frequently; interact and respond appropriately to coworkers occasionally but not in tandem work; never interact and respond appropriately to the public; and tolerate few changes in a routine work setting. The hearing transcript shows that this RFC finding was used by the ALJ to pose the hypothetical questions to the VE.

In my review of the record, it is evident that the ALJ considered Cintrón's complaints, and evidence from the treating, consultative, and non-examining physicians. I did not find a specific weight assigned to the evidence from Dr. López, APS, or Dr. Sepúlveda in the ALJ's opinion, but the ALJ summarized, analyzed, and considered those records at Tr. 49-52. Cintrón's argument that the ALJ did not consider this evidence is without merit. The ALJ's lengthy summary of the treating, examining, and consultative opinions, and the ALJ's explanations of how these played into the RFC assessment, are sufficient to give the court notice of the treatment given to those medical opinions in the RFC assessment and final non-disability determination.

As to Cintrón's argument that the ALJ did not give Dr. López's record and opinion controlling weight, that discretion lies with the ALJ. While a claimant is responsible for providing the evidence of an impairment and its severity, the ALJ is responsible for resolving any evidentiary conflicts and determining the claimant's RFC. 20 C.F.R. § 404.1545(a)(3); *see also Tremblay v. Sec'y of Health & Human Servs.*, 676 F.2d 11, 12 (1st Cir. 1982). It was therefore the ALJ's duty to weigh all the evidence and make certain that the ALJ's conclusion rested upon clinical examinations as well as medical opinions. *Rodríguez v. Sec'y of Health & Human Servs.*, 647 F.2d 28, 224 (1st Cir. 1981). Regulations provide that the opinion of a treating physician is presumed to carry controlling weight as long as it is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.  20 C.F.R. § 404.1527(c)(2).

Cintrón also argued that the ALJ erred in finding that Dr. López's record established a generally normal mental examination instead of finding that the record established that Cintrón had perceptual disturbances based on the anti-psychotic drugs prescribed and Cintrón's reports of hallucinations. Because she was prescribed the anti-psychotic drug Risperdal by Dr. López and APS, Cintrón claims that a reasonable mind would conclude that the record established perceptual disturbances. But the record tells otherwise. Dr. López's 2014 mental report and progress notes

state that she did not present hallucinations or perceptual distortions. The record from her hospitalizations states that she denied having perceptual disturbances. Dr. Cortés noted that the medications prescribed to Cintrón were for a severe condition even though her allegations as to her condition were partially credible and not fully supported by the medical evidence. The ALJ also noted that Cintrón's "testimony and lack of ability to remember even the most basic personal information, such as her name, is inconsistent with the overall medical evidence, including the medication prescribed" and did not support her representative's assertion of extreme restrictions in her attention, concentration, and ability to maintain pace, and her need to have instructions repeated every hour even if she were limited to simple routine tasks. Tr. 49.

Cintrón then argues that Dr. Cortés's second opinion could not be trusted because Dr. Cortés initially found that the case met listing 12.04 but after reviewing the APS record determined that Cintrón could work.  The record shows that the case was referred to Dr. Cortés again after new evidence from APS was received. While it is the claimant's responsibility to provide evidence of an impairment, it is not within the claimant's purview to decide how this evidence is weighed. Dr. Cortés noted that the record reflected that Cintrón had received duplicate services for her mental condition during the same time period. Dr. Cortés gave more weight to the progress notes from APS over evidence from Dr. López because he did not submit progress notes to confirm statements or visits by Cintrón.

Also, Cintrón's argument that the ALJ's conclusion was based solely on the State agency psychological consultants is without merit. There is evidence other than the non-examining consultants' assessments that is inconsistent with Dr. López's more restrictive assessment that Cintrón did not have the capacity to make appropriate decisions, had a reduced ability to tolerate stress and would be easily irritated, could not pay attention and concentrate on following instructions and completing a task, and was unable to handle funds. Dr. Cortés and Dr. De Paz assessed that based on the record evidence, Cintrón was able to understand, remember, and execute simple one or two-step instructions; maintain attention and sustain concentration, persistence, and pace; adapt to changes; and interact adequately with others. Dr. Sepúlveda also evaluated Cintrón and assessed that Cintrón had moderate functional limitations and could do simple tasks, solve simple problems, and make simple decisions. Additionally, the ALJ considered the ample evidence available in the record that Cintrón continuously and voluntarily received treatment for her depression by different sources with no signs of worsening. Treatment included hospitalizations

Cintrón v. Commissioner of Social Security, Civil No. 19-1297 (BJM)                    16

due to emotional crises, monthly or bimonthly appointments with a psychiatrist, and prescribed medications for her symptoms. As long as she complied with her medication regimen, she remained stable. The ALJ discussed that with conservative psychotherapy and medication management, her GAF scores were 40-50 (as in Dr. López's record), 50-70 (First Hospital Panamericano record), and 60-65 (as per the APS record). "GAF is a scale from 0 to 100 used by mental health clinicians and physicians to subjectively rate the social, occupational, and psychological functioning of adults.'" *Hernández v. Comm'r of Soc. Sec.*, 989 F. Supp. 2d 202, 206 n. 1 (D.P.R. 2013) (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*-IV 32 (4th ed. text rev. 2000) ("DSM–IV–TR")). A GAF score in the 41-50 range indicates moderate difficulties in social and occupational functioning.[4] *López-López*, 138 F. Supp 3d at 102 f.n. 7 *quoting* SDM-IV at 34. I note that the ALJ used the GAF scores in the record, in conjunction with other evidence, as part of the RFC discussion and non-disability findings. The ALJ does not exclusively rely on the GAF scores to assess the severity of Cintrón's mental condition, but makes reference to them in determining her functional abilities and limitations.

Ultimately, it is the Commissioner's responsibility to determine issues of credibility, draw inferences from the record evidence, and resolve conflicts in the evidence (*see Ortiz*, 955 F.2d at 769 (citing *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981); *Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 141 (1st Cir. 1987)). After thoroughly and carefully reviewing the record, I find that there is substantial evidence to support the ALJ's RFC finding. The decision is therefore affirmed.

---

[4] The SSA's administrative memorandum AM-13066 advises adjudicators that a GAF score should not be dispositive of impairment severity. GAF scores were discontinued in the current Diagnostic and Statistics Manual of Mental Disorders (5th edition) ("DSM-V"), which was published in 2013, but were still part of the DSM-IV-TR at the time of Cintrón's treatment. Because the GAF scores are no longer used in the DSM-V, the SSA directed adjudicators through the AM-13066 to continue receiving and considering GAF scores as they would with other opinion evidence, but that the score must have supporting evidence to be given significant weight. *Valentín-Incle v. Comm'r of Soc. Sec.*, Civ. No. 15-2137 (MEL), 2018 U.S. Dist. LEXIS 215060, 2018 WL 6721340, at *10 n.2 (D.P.R. Dec. 19, 2018) (citations omitted).

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 25th day of March, 2021.


_s/Bruce J. McGiverin_
BRUCE J. McGIVERIN
United States Magistrate Judge